IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ROSE M. SMITH, )
)
        Plaintiff, )
)
vs. ) Case No. 16-cv-01072-JPG-CJP
)
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
)
        Defendant.[1] )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Rose M. Smith, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed for DIB in November 2010 alleging a disability onset date of January 12, 2010. Administrative Law Judge (ALJ) William Hafer held an evidentiary hearing and denied her application for benefits. (Tr. 14-28.) Plaintiff appealed to this Court, which remanded the case to the Social Security Commissioner on December 28, 2015. (Tr. 831-48.) On remand, Administrative Law Judge Jason R. Yoder denied plaintiff's application in a decision dated July 14, 2016. (Tr. 714-32.) Plaintiff exhausted her administrative remedies and filed a timely complaint in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

1. The ALJ's credibility determination was erroneous.

2. The ALJ erred in evaluating the opinion of plaintiff's physical therapist.

3. The ALJ erred in giving little weight to the opinion of plaintiff's treating physician, Dr. Nekzad.

4. The ALJ's analysis of the third-party function report from plaintiff's husband was legally insufficient.

5. Substantial evidence did not support the residual functional capacity (RFC) determination.

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of

the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported

by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Yoder followed the five-step analytical framework described above. He found plaintiff met the insured status requirements through March 31, 2011, and had not engaged in substantial gainful activity from the alleged onset date through her date last insured. The ALJ also determined plaintiff had severe impairments of degenerative disc disease (DDD) of the cervical and lumbar spine, rheumatoid arthritis, multiple joint degenerative joint disease, a history of rotator cuff tears and tendinosis, chronic obstructive pulmonary disease (COPD), obesity, anxiety disorder, dysthymic disorder, panic disorder with agoraphobia, a history of

4

alcohol dependence, and marijuana use. (Tr. 716-17.)

ALJ Yoder determined plaintiff had the RFC to perform sedentary work, with several restrictions. He went on to find plaintiff could not perform any past relevant work but could perform other jobs that existed in significant numbers in the national economy. Thus, plaintiff was found not disabled. (Tr. 723-32.)

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

Plaintiff indicated that COPD, osteoarthritis, rheumatoid arthritis, DDD, degenerative joint disease, anxiety, and panic attacks limited her ability to work. Plaintiff's highest level of education was eighth grade, and she attended special education classes while in school. She previously worked as an assistant manager at a discount store, as a CNA at an assisted living facility, and as a cook, cashier, and stocker at a restaurant. (Tr. 228-29.)

Plaintiff alleged the last time she worked she coughed all day to the point she almost passed out. Her body hurt so bad that she would sit in her car after work and cry. Plaintiff suffered from IBS and pain in her shoulders, hands, hips, back, knees, and feet. (Tr. 251-52.)

Plaintiff alleged it was sometimes difficult to put on her pants, bra, and shirt. She also had to sit to dry her hair due to pain in her feet and lower back. Shaving also caused pain in her hips and back. (Tr. 252.)

Plaintiff could walk "maybe" a half a mile before she needed to stop and rest. When asked how well she followed written instructions, plaintiff responded, "I don't." She could

follow spoken instructions fairly well and got along with authority figures well. (Tr. 256-57.)

Plaintiff's husband, Tom Smith, completed a third party function report on January 14, 2011. (Tr. 261-68.) He stated plaintiff experienced shortness of breath and pain in her knees, lower back, and hips. She was often hospitalized. From the time plaintiff woke up until the time she went to bed, plaintiff cleaned her house, watched television, and read. Plaintiff could not sleep well and was no longer able to do physical work due to her conditions. She had problems putting on her shirt, pants, and bra and had to sit to dry her hair sometimes. Shaving hurt her hips and back. Plaintiff prepared meals every day, which took her thirty minutes. She could not be on her feet long. She was able to clean, do laundry, and iron two to three times per week, with assistance. Plaintiff did not do yardwork because she could not handle the heat and she experienced shortness of breath. Plaintiff grocery shopped once per week. She could walk two blocks before needing to stop and rest for twenty minutes. She had no trouble paying attention but could not follow written instructions well. Plaintiff could not handle stress or changes in routine. She got along with authority figures well. (Tr. 261-68.)

    **2.    Medical Records**

Plaintiff presented to Southern Illinois Healthcare Outpatient Rehabilitation Services on November 3, 2011, for an evaluation of her physical abilities. Mallai Wilson, plaintiff's physical therapist, opined plaintiff could occasionally lift or carry up to twenty pounds; could never lift or carry more than twenty-one pounds; could occasionally sit; could infrequently to occasionally walk; and could infrequently stand. Plaintiff could also infrequently reach overhead and push/pull with her right hand and occasionally reach, handle, finger, and feel with her right hand. Plaintiff could occasionally reach overhead, reach otherwise, handle, finger, feel, and push/pull with her left hand. She could occasionally operate foot controls with both her right and left foot.

6

Plaintiff could occasionally balance, infrequently stoop and crouch, and never kneel or crawl. It was unsafe for plaintiff to climb ladders or scaffolds, but plaintiff could occasionally climb stairs and ramps. Plaintiff could never be around unprotected heights, moving mechanical parts, dust, odors, fumes, pulmonary irritants, or vibrations. She could infrequently tolerate extreme heat and cold and occasionally operate a motor vehicle and tolerate humidity and wetness. (Tr. 563-64.) Ms. Wilson also opined plaintiff had moderate noise limitations. (Tr. 565.)

On physical exam, plaintiff demonstrated that her left and right cervical, shoulder, elbow, and wrist range of motion (ROM) were within functional limits. Her manual muscle testing (MMT) on her left shoulder, elbow, and wrist, was five out of five. Plaintiff's MMT on her right shoulder was three or four out of five, and her elbow and wrist were five out of five. Her trunk side bending on the left and right were within functional limits; her trunk rotation on the left and right were minimally decreased; and her trunk flexion/extension was to mid shin on the left and minimally decreased on the right. (Tr. 563.)

Ms. Wilson observed plaintiff had postural sway, side to side, and a slight antalgic gait on the right. She also noted that plaintiff was able to perform a twenty-pound box lift and carry. However, plaintiff experienced some shortness of breath and needed to take a short break. (Tr. 563.)

### 3. State Agency Consultant RFC Assessments

Dr. Fred Klug evaluated plaintiff on February 14, 2011, as part of a psychological consultation. (Tr. 493-96.) Dr. Klug's diagnostic impressions consisted of dysthymic disorder, panic disorder with agoraphobia, generalized anxiety disorder, history of alcohol dependence, COPD, DDD, and rheumatoid arthritis. (Tr. 495.)

On March 1, 2011, Dr. Howard Tin completed a psychiatric review technique and mental

RFC assessment. (Tr. 504-17, 518-21.) He found plaintiff had mild restrictions of activities of daily living (ADLs); mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; moderate difficulties in the ability to understand and remember detailed instructions. (Tr. 514.) He specified that plaintiff had moderate difficulties in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 518.)

On March 31, 2011, Dr. Julio Pardo completed an RFC assessment of plaintiff. (Tr. 555-62.) He determined plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight hour workday; sit about six hours in an eight hour workday; and push and/or pull an unlimited amount. (Tr. 556.) Plaintiff could occasionally climb, balance, stoop, knee, crouch, and crawl. (Tr. 557.) Dr. Pardo also opined plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 559.)

4. **Dr. Nekzad's RFC Assessment**

On April 25, 2012 or 2013,[2] Dr. Matin Nekzad completed a questionnaire for plaintiff's attorney for the purpose of her claim. (Tr. 694-97.) He indicated he had treated plaintiff since November 2011. Dr. Nekzad reviewed Ms. Wilson's functional capacity assessment from November 3, 2011, and concurred with her findings. He indicated that plaintiff's limitations described in the report were correct. Additionally, he believed plaintiff could perform a job that required her to sit for two hours at a time with only scheduled fifteen-minute breaks every two hours. He also stated that "persistent pain and decreased range of motion, despite surgery"

---

[2] The questionnaire is dated April 25, 2012 (Tr. 694), while Dr. Nekzad's SOAP notes from April 25, 2013, indicated that Dr. Nekzad completed the form on that date (Tr. 1322).

prevented plaintiff from using her upper extremities for more than one third of the day for repetitive activities. Dr. Nekzad also opined that, due to her COPD, she could not sustain work at any exertional level for eight hours a day, five days a week. Dr. Nekzad stated plaintiff would need to leave work or be absent from work more than two days per month due to symptoms or treatment. (Tr. 694.)

### 5. The Evidentiary Hearing

ALJ Yoder conducted an evidentiary hearing on June 7, 2016, during which plaintiff was represented by counsel. (Tr. 742-805.) A vocational expert (VE) testified regarding several hypothetical individuals with plaintiff's age, education, and past work experience.

Plaintiff testified she worked at Quizno's, in the deli at IGA, at Farm Fresh as a cashier, at Family Dollar as an assistant manager and cashier, and as a CNA. (Tr. 749-57.)

The first hypothetical individual was limited to lifting and carrying twenty pounds occasionally, ten pounds frequently, sitting for at least six out of eight hours, and standing and walking for about six out of eight hours. This person could occasionally climb ladders, ropes, scaffolding, ramps and stairs, balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to fumes, dust, odors, gases, and areas of poor ventilation. Because of her moderate limitations in the ability to understand, remember, and carry out detailed instructions, the individual would be limited to understanding and remembering simple instructions and carrying out simple, routine tasks that required the use of little independent judgment or decision-making. Also, because of some issues with prolonged attention and concentration, the individual would be able to work in two-hour segments at a time but would require a short ten to fifteen-minute break in between those two-hour segments. She could perform tasks at an average production rate but should not perform tasks requiring stringent speed or strict base rate

9

production requirements. The plaintiff could occasionally interact with the public and could frequently interact with co-workers and supervisors due to her anxiety. (Tr. 784-85.) The VE testified this person could perform plaintiff's past job as a deli slicer if her job tasks did not include running the cash register. There were also other jobs available in the economy the individual could perform. (Tr. 785-86.)

The ALJ posed a second hypothetical person to the VE with the same limitations as the first hypothetical, except this person could never climb ladders, ropes, or scaffolding. In addition to those limitations, this individual could only occasionally reach overhead bilaterally because of prior shoulder and neck issues. The person could frequently reach in all other directions. Because of arthritis issues with her hands, hypothetical two was limited to frequent, but not constant, use of the bilateral upper extremities for handling, grasping, and fine fingering of objects. She also had to avoid concentrated exposures to heat and cold, wetness, and dangerous workplaces hazards. (Tr. 786-87.) The VE testified that based on his own expertise, but not the Dictionary of Occupational Titles, this person could perform jobs that existed in the economy. (Tr. 787-91.)

The ALJ then asked whether an additional limitation of being off task for five percent of each workday, or three minutes per hour, would affect the VE's response to hypotheticals one or two. The VE responded, "I really don't think at that percentage it would because we're all probably no matter skilled or unskilled what we're doing we're probably all off at least three minutes out of an hour." (Tr. 791.)

For the fourth hypothetical, the ALJ asked the VE to consider a person with the limitations in hypothetical two "except for that 5% off task." Moreover, this person was limited to sedentary work, lifting and carrying ten pounds occasionally and less than ten pounds

10

frequently. This person could sit for at least six out of eight hours and stand and walk for about two out of eight hours. The VE testified jobs existed in the economy that hypothetical four could perform. (Tr. 792-93.)

The ALJ then asked, "And for hypothetical #5, if I added again if the individual were to be off task 5% of a workday or workweek . . . would that change your opinion as those jobs in hypothetical 4?" The VE testified that it would not. (Tr. 793.)

The ALJ asked the VE to consider an individual who was limited to lifting and carrying twenty pounds occasionally, no weight frequently, sitting for two and a half out of eight hours each day, standing for less than two and a half out of eight hours each day, and walking for less than two and a half hours out of eight hours each day. This person could less than occasionally reach overhead with the right upper extremity and could occasionally reach overhead with the left upper extremity; reach in all other directions with both upper extremities; and handle, finger, feel, push, and pull with the bilateral upper extremities. Hypothetical six could also occasionally operate foot control and push and pull with the bilateral lower extremities. The postural and environmental limitations "previously indicated" remained the same. (Tr. 793-94.) The VE testified there would be no jobs this person could perform. (Tr. 794.)

The ALJ agreed that a person who was off task more than fifteen percent of the day or missed more than two days per month at unskilled work would not be able to maintain employment. (Tr. 804.)

## Analysis

As a preliminary matter, the Court acknowledges plaintiff's argument that the Commissioner waived various issues by failing to respond. Although the Commissioner did not meaningfully respond to several of plaintiff's arguments, they will still be addressed since

remand is warranted on the substance of the claim.

   *1. Substantial Evidence did not Support the RFC Assessment*

The ALJ determined plaintiff had the RFC to perform sedentary work with several restrictions. He opined, "Because of her moderate limitations in performing activities within a schedule and maintaining punctuality within customary tolerances," plaintiff would be off task for five percent of the workday. The ALJ equated five percent to three minutes each hour. (Tr. 723.) At the evidentiary hearing, however, the VE testified that regardless of whether an individual is performing skilled or unskilled work, "we're probably all off at least three minutes out of an hour." (Tr. 791.) The ALJ failed to reconcile how plaintiff, who had moderate limitations with punctuality and maintaining a schedule, would be off task no more than an individual who was totally unimpaired in this area. In addition, the record does not contain a medical opinion supporting this conclusion. As plaintiff contends, the five percent off-task limitation appears to have no evidentiary basis in the record and conflicts with the ALJ's finding of moderate impairments in scheduling and punctuality.

Notably, the Commissioner does not address this inconsistency at all. Rather, she reiterates that "courts do not require an extensive explanation" of the RFC assessment. (Doc. 24, p. 13.) However, the courts do require a logical one. The case must, therefore, be remanded. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (Where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."). For the sake of completeness, the remaining arguments will also be addressed.

   *2. The Credibility Determination*

ALJ Yoder opined that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements

12

concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence of record." (Tr. 724.)

Plaintiff attacks this determination, noting the Seventh Circuit Court of Appeals has described similar language as "meaningless boilerplate." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013). "However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Id.* at 367-68.

The reviewing court affords the ALJ's credibility determination "considerable deference" and will challenge it only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). The ALJ must articulate specific reasons for his determination so that the reviewing court can determine whether substantial evidence supports the decision. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

ALJ Yoder opined plaintiff's complaints of constant neck pain were inconsistent with her reports of relief from radiofrequency lesioning. The ALJ also noted that plaintiff told Dr. Macintosh she was not doing her home exercises; Dr. Macintosh could not identify an obvious cause for plaintiff's discomfort; and Dr. Macintosh reported plaintiff was able to do most activities without discomfort following shoulder injections. (Tr. 725.) These references are logical and permit the Court to examine the evidence the ALJ relied on when concluding plaintiff was not fully credible. *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013).

Plaintiff also argues the ALJ's credibility determination was perfunctory because he did not sufficiently evaluate plaintiff's complaints of pain. Plaintiff cites *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001) in support of her argument.

In *Zurawski*, the ALJ failed to address medical evidence that supported the claimant's

allegations of disabling pain, including MRI results showing a bulging disc and DDD, epidural injections, and prescription medications. The Seventh Circuit Court of Appeals remanded the case because the court was "unable to tell whether the ALJ investigated 'all avenues' that relate[d] to Zurawski's complaints of pain because her decision offer[ed] no clue as to whether she examined the full range of medical evidence as it relate[d] to his claim." *Zurawski*, 245 F.3d at 888.

This case is distinguishable from *Zurawski*. The ALJ here addressed plaintiff's complaints of pain in the agency forms, the evidentiary hearings, and throughout the medical records. For example, ALJ Yoder noted: "On December 3, 2010, the claimant reported she was making good progress in therapy;" "When examined in June 2011, the claimant's right shoulder was much better after an injection and she was able to do most activities without much discomfort;" and "[Plaintiff] added that . . . none of her prescription pain medications helped her." (Tr. 724-25.)

Unlike *Zurawski*, plaintiff does not cite any substantiating portions of the record the ALJ ignored. Ultimately, ALJ Yoder set forth specific evidence for the adverse credibility determination and "minimally articulate[d]" his justification for the finding. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Thus, the determination was not patently wrong and it will not be disturbed.

*3. The Physical Therapist's Opinions*

Plaintiff also asserts the ALJ erred in assessing the opinions of plaintiff's physical therapist, Mallai Wilson.

A physical therapist is not an acceptable medical source for determining a claimant's impairments. 20 C.F.R. § 404.1513. However, his or her opinion is still entitled to consideration

as evidence of the severity of an impairment and cannot be arbitrarily rejected. *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004).

ALJ Yoder adequately considered Ms. Wilson's opinions, and the cases plaintiff cites to in support of her argument are distinguishable. In *Hamilton v. Colvin*, 525 F. App'x 433, 439 (7th Cir. 2013), "[t]he ALJ gave no explanation for rejecting [the physical therapist's] opinion other than to say that 'the record does not support [her] finding . . . .'" In *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004), the Seventh Circuit Court of Appeals stated it was arbitrary to give no weight at all to the physical therapist's report solely because the claimant had exaggerated her condition to the therapist.

Here, ALJ Yoder opined that Ms. Wilson's observations related to plaintiff's MMT and ROM were not proportionate with the limitations she placed on plaintiff. He also noted Ms. Wilson's findings were inconsistent with the findings of Dr. Macintosh, Dr. Leung, and Dr. Sawar. Moreover, Ms. Wilson determined plaintiff had noise limitations, but the ALJ noted there was no indication plaintiff had a hearing impairment. (Tr. 728.)

Plaintiff argues, "The ALJ noted that 'only minimal decrease range of motion of trunk rotation and trunk flexion/extension was noted' (AR 728) but did not explain how he could have determined that these limitations were 'minimal' without calling a medical expert . . . ." (Doc. 18, p. 12.) However, Ms. Wilson, herself, found that plaintiff demonstrated a minimal decrease in ROM, albeit using abbreviations. (Tr. 563.)

The ALJ was not required to mention every piece of evidence, so long as he provided an accurate and logical bridge between his decision and the evidence. Accordingly, substantial evidence supports his decision to afford Ms. Wilson's opinion limited weight.

*4. The Treating Physician's Opinion*

Plaintiff next asserts the ALJ erred by giving "little weight" to the opinions of Dr. Nekzad, a treating physician. Dr. Nekzad completed a form on April 25, 2013, which contains several questions regarding plaintiff's limitations. The form instructs the reviewing physician to circle one of two responses and/or fill in a blank. For instance, "Due to her _____ she **can/cannot (circle one)** use her upper extremities for more than 1/3 of the day for repetitive activities." (Tr. 694.) Based on these responses, Dr. Nekzad indicated plaintiff could perform a job that required her to sit two hours at a time with scheduled fifteen minute breaks every two hours; plaintiff's persistent pain and decreased ROM limited her ability to use her upper extremities; her COPD prevented her from sustaining work at any exertional level for eight hours a day, five days a week; and plaintiff would need to leave work or be absent more than two days per month. (Tr. 694.)

Pursuant to 20 C.F.R. § 404.1527(c), the Social Security Commission generally gives more weight to a medical opinion from the plaintiff's treating source, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [plaintiff's] case record." If the ALJ concludes the treating physician's opinions are not entitled to controlling weight, he must articulate "good reasons" for this determination, in consideration of the factors set forth in 20 C.F.R. § 404.1527(d).[3] *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).

ALJ Yoder gave Dr. Nekzad's opinions "little weight" because Dr. Nekzad endorsed Ms. Wilson's assessment and because he rendered his report more than one year after plaintiff's date

---

[3] These factors evaluate (1) whether an examining relationship existed; (2) the treatment relationship, including the length, nature, and extent of the treatment; (3) whether the physician's opinion is supported by sufficient explanations and objective medical evidence; (4) whether the physician's opinion is consistent with other opinions in the record; (5) whether the physician is a specialist; and (6) any other factors brought to the ALJ's attention.

last insured (DLI). (Tr. 728-29.) It was not erroneous for the ALJ to assign little weight to the portion of Dr. Nekzad's report that concurs with Ms. Wilson's opinions since he already identified why he gave little weight to Ms. Wilson's findings. Furthermore, any error in the ALJ's analysis of the remaining portions of Dr. Nekzad's report was harmless. "We will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). The Seventh Circuit Court of Appeals held in *McKinzey* that an error is harmless if "no reasonable ALJ would reach a contrary decision on remand . . . ." *Id.*

Dr. Nekzad began treating plaintiff in November 2011, approximately eight months after plaintiff's DLI in March 2011. He completed the report in April 2012 or 2013 yet never specified whether his opinions were retrospective. A standard statement in the report provides, "She was probably limited to this degree as of January 12, 2010. **I agree/I don't know**." Dr. Nekzad did not mark "I agree" or "I don't know." In addition, Dr. Nekzad's SOAP notes do not offer any further clarity because he wrote them in the present tense. For example, "Her chronic pain of osteoarthritis and rheumatoid arthritis *is* debilitating." (emphasis added) (Tr. 1322.)

Dr. Nekzad's opinions are post-DLI and do not purport to assess plaintiff's abilities as of the onset date. Therefore, any reasonable ALJ would reach the same conclusion on remand and the error in the analysis is harmless.

    5.  *The Third-Party Function Report*

Plaintiff next contends the ALJ erred in assessing the third-party function report her husband, Mr. Smith, submitted. The ALJ did not give any weight to the report "to the extent that it indicates that the claimant's pain and other problems prevented her from working." (Tr. 729.) The ALJ explained that Mr. Smith did not observe plaintiff in a professional capacity and the

17

record did not support his opinion.

Plaintiff raises a valid point in arguing the ALJ should have fleshed out which portions of the report the evidence did not support. However, the ALJ's analysis was not erroneous because plaintiff's allegations and Mr. Smith's function report were "essentially redundant." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993); *see also Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996).

The Seventh Circuit Court of Appeals has opined an ALJ cannot ignore an entire line of evidence. *Books*, 91 F.3d at 980. It has also held, though, that third-party testimony does not constitute an entire line of evidence when it serves to "reiterate, and thereby corroborate, [the claimant's] own testimony . . . ." *Id.* Mr. Smith's and plaintiff's functions reports are practically the same, so to the extent the ALJ found plaintiff not fully credible, he necessarily found Mr. Smith's statements not credible as well. Thus, the ALJ did not err in failing to explicitly discuss and weigh his statements.

## Conclusion

The Commissioner's final decision denying application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE: September 12, 2017**

                                    s/ J. Phil Gilbert
                                    **J. PHIL GILBERT**
                                    **DISTRICT JUDGE**